## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**ROTHA SUE PHILLIPS**                                                                                     **PLAINTIFF**

**v.**                                                    **No. 4:11–CV–854–BD**

**MICHAEL J. ASTRUE, Commissioner,**
**Social Security Administration**                                                                          **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Rotha Sue Phillips sought judicial review of the denial of her applications for

disability insurance benefits and supplemental security income.[1]  This is the second time

the court has reviewed this case.  On the first review, the court determined that the

Commissioner's ALJ erred at step two of the disability-determination process by

determining that Ms. Phillips's impairments were not severe.[2]  The court remanded the

case to the Commissioner for a step-four analysis.

**The Commissioner's second decision**.  On remand, the ALJ determined at step

four that Ms. Phillips had the residual functional capacity ("RFC") to do full range of

medium work.[3]  Then, relying on vocational testimony obtained during Ms. Phillips's

first hearing, the ALJ determined Ms. Phillips could do her past relevant work.  Because

she could do her past work, the ALJ concluded that Ms. Phillips was not disabled.  After

---

[1]*See* docket entry # 2 (complaint).

[2] SSA record at p. 227.

[3]*Id*. at p. 216.

the Appeals Council denied Ms. Phillips's request for review,[4] the ALJ's decision

became a final decision for judicial review.[5]  Ms. Phillips filed this case to challenge the

decision.

**RFC**.  Ms. Phillips first challenges the ALJ's RFC determination.  Her argument is

a general one:  "A fifty-six year old female with a bulging disc who is morbidly obese

cannot credibly be expected to lift 25 pounds frequently and 50 pounds occasionally,

not frequently bend, stoop, or crouch."[6]  Ms. Phillips argues that she cannot do medium

work[7] because of degenerative disc disease of the lumbar spine and obesity.  She

maintains that she cannot frequently bend, stoop, or crouch.

"A claimant's RFC represents the most [she] can do despite the combined effects

of all of [her] credible limitations and must be based on all credible evidence."[8]  "In

determining the claimant's [RFC], the ALJ has a duty to establish, by competent medical

---

[4] SSA record at p. 205.

[5] *See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating that "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the Commissioner's appeal procedure permits claimants to appeal only final decisions).

[6] Docket entry # 13, p. 9.  Ms. Phillips was 50 years old when she applied for disability benefits.

[7] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967(c).

[8] *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011).

evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."[9]  The issue of the credibility of Ms. Phillips's allegations about her limitations was resolved in the first judicial review of this case.[10]  What remains is determining whether competent medical evidence, after giving appropriate consideration to all of Ms. Phillips's impairments, supported the ALJ's determination that Ms. Phillips could do medium work.

The competent medical evidence flowed from a MRI[11] of Ms. Phillips's lumbar spine and treatment by an orthopedist.  The MRI showed "mild" degenerative disc disease at L5-S1 with a posterior annular tear and a "small" broad-based disc protrusion in the lumbar spine.[12]  The characterization of degenerative disc disease as "mild" indicated that Ms. Phillips retained substantial RFC.  The presence of a disc protrusion and its characterization as "small" had little evidentiary value because a damaged or diseased disc does not necessarily mean a person will have pain or another symptom.[13]

---

[9] *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

[10] SSA record at p. 233 (agreeing with the ALJ that Ms. Phillips exaggerated the duration and degree of pain and limitation).

[11] An MRI "is the procedure of choice for finding soft-tissue causes of low back pain. It can usually assist in identifying disk herniation, infections…, hematomas, and tumor." Dan J. Tennenhouse, Attorneys Med. Deskbook § 24:17 VII (4th ed.).

[12] SSA record at p. 161.

[13] *See* 2 Lawyers' Med. Cyclopedia § 16.9[C] ("Whether a patient experiences discomfort from the disc disease depends on …canal, and foramen size, as well as the

Spinal stenosis or disc impingement causes symptoms.[14]  If a disc protrusion impinges on the thecal sac or a nerve root, a person will likely experience symptoms.[15] Symptoms include low back pain; pain in the thighs, knees, or feet; numbness; tingling; a burning sensation; muscular weakness; and affection of reflexes.[16]  Ms. Phillips complained about some of these symptoms.  The MRI though showed impingement of the thecal sac or a nerve root.[17]  The MRI showed nothing that explained the degree of pain and limitation Ms. Phillips alleged—no evidence of disc extrusion,[18] canal stenosis,

---

percentage of disc herniated.); Dan J. Tennenhouse, Attorneys Med. Deskbook § 24:17 VII (4th ed.) ("Protruded disks usually cause no symptoms."); 2 Lawyers' Med. Cyclopedia § 16.9 (explaining that a disc "protrusion may or may not compress the spinal cord or nerve roots, causing neurological symptoms and signs").

[14] *See* Mary Jeanne Krob & Laura Brasseur, 5 Attorneys Textbook of Med. (3d ed.) P 15.32 (explaining that a disc protrusion may be asymptomatic unless there is some degree of spinal stenosis or disc impingement).

[15] Dan J. Tennenhouse, Attorneys Med. Deskbook § 26:8(3) (4th ed.) ("[L]umbar nerve root compression at the spine produces the sensation of pain "radiating" down the leg along the sciatic nerve.").

[16] Dan J. Tennenhouse, Attorneys Med. Deskbook § 24:17 II (4th ed.) ("When intervertebral discs are damaged, the soft contents protrude or are expelled and press against adjacent nerves. This can cause leg pain, and if severe, can result in leg weakness or paralysis.").

[17] SSA record at p. 161.

[18]*See* Dan J. Tennenhouse, Attorneys Med. Deskbook § 24:17 III (4th ed.) ("Extruded disks usually cause symptoms.").

or foraminal stenosis.[19]  Evidence of one of these conditions would have supported the

alleged degree of severity and supported a reduction in RFC.

Because Ms. Phillips persisted in complaining about pain, the orthopedist

ordered a nerve conduction study[20] and an electromyogram.[21]  Both tests were normal.[22]

Neither test showed impingement.

The orthopedist's exam findings were also negative:  The result of straight leg

raising was negative.[23]  This result was important because "the majority of patients with

_____

[19] Lumbar canal stenosis is the narrowing of the spinal canal or the side canals protecting the nerves.  Foraminal stenosis is the narrowing of the foramen through which the nerve root exits the spinal canal.  The conditions have similar symptoms: radiating pain that travels from the low back to the hips, buttocks, and the back of the leg; numbness; tingling; weakness; and sometimes cramping.  *See* 2-16 Lawyers' Med. Cyclopedia § 16.32a.

[20] "Nerve conduction studies are performed by attaching electrodes over muscles (motor nerve conduction studies) or sensory nerve fibers (sensory studies).…The appropriate nerve or muscle is stimulated, and the output from the electrode is recorded in order to measure nerve conduction velocity or the electrical characteristics of muscle contraction." Dan J. Tennenhouse, Attorneys Med. Deskbook § 17.14 (4th ed.).

[21] *See* 2 Lawyers' Med. Cyclopedia § 16.9D[8] (explaining how electromyography isolates specific nerve roots for identifying compression); Dan J. Tennenhouse, Attorneys Med. Deskbook § 24:17 VII (4th ed.) ("Myelography is used to visualize the spinal cord and nerve roots, and can usually identify encroachment on these structures by a herniated disk.").

[22] SSA record at pp. 154 & 249.

[23] *Id*. at p. 159 (Aug. 16, 2007); p. 250 (Sept. 17, 2007); p. 248 (Oct. 5, 2007).

acute herniated discs will have positive results."[24]  Ms. Phillips had a normal ankle jerk

reflex test.[25]  This test was important because it tested the S1 nerve root (the site of the

protrusion).[26]  The orthopedist found no weakness in the extensor hallucis longus[27]—the

muscle that flexes the foot and extends the great toe.[28]  This finding was important

because the L5 (the site of the protrusion) nerve root stimulates the extensor hallucis

longus, a neurological level cannot be assessed by reflex testing.  In addition, there was

no Babinski sign[29]—an abnormal response "characterized by dorsiflexion (moving away

from the sole of the foot) of the great toes and fanning out of the other toes."[30]  This

---

[24] *See* Mary Jeanne Krob & Laura Brasseur, 5 Attorneys Textbook of Med. (3d ed.) P 15.34[1]; 2 Lawyers Med. Cyclopedia § 16.9D[1] ("For the test to be considered positive, pain must be reproduced in the leg, not solely in the back.…In the straight-leg test, the L5 and S1 roots move 2 to 6 mm within their intervertebral foramina, which subjects them to tensile and compressive forces.").

[25] SSA record at p. 159 (Aug. 16, 2007); p. 250 (Sept. 17, 2007); p. 248 (Oct. 5, 2007).

[26] A positive ankle-jerk reflex test is significant for: "Impairment of the S1 or S2 nerve roots, as with low lumbar disk herniation; impairment of the sciatic nerve; peripheral neuropathy; hypothyroidism (decreased or slowed reflex). (2) Lesions of the pyramidal tracts of the central nervous system; alcoholic withdrawal."  Dan J. Tennenhouse, Attorneys Med. Deskbook § 18:4 (4th ed.).

[27] SSA record at pp. 159 & 248.

[28] Mary Jeanne Krob & Laura Brasseur, 5 Attorneys Textbook of Med. (3d ed.) 15.35[2].

[29] SSA record at pp. 159 & 248.

[30] Mary Jeanne Krob & Laura Brasseur, 5 Attorneys' Textbook of Med. 15.35[1] (3d ed.).

result was important because it ruled out the presence of a lesion in the bundle of nerves that supplies voluntary muscles.[31]  Ms. Phillips's calves and thighs were symmetrical in circumference.[32]  "Symmetrical muscle bulk and strength are expected unless the patient has a neurologic impairment or a history of lower extremity muscle or joint problem."[33]  Ms. Phillips had no history lower extremity muscle or joint problem, so the result indicated that Ms. Phillips had no neurological impairment.

The orthopedist prescribed conservative treatment in the form of home exercises, and later in the form of physical therapy.[34]  The orthopedist prescribed no prescription pain medication.  Ms. Phillips did not do the exercises.  She testified that it hurt to do the exercises.[35]

Ms. Phillips's last visit with the orthopedist was in October 2007.  During her second hearing—in February 2010—she testified that she sought no further treatment for her back.[36]  All of this suggests that Ms. Phillips significantly over-stated her

---

[31] *Id.*

[32] SSA record at p. 159.

[33] U.S. Agency for Health Care Policy & Research, Acute Low Back Pain Problems in Adults: Assessment & Treatment, Quick Reference Guide for Clinicians, Clinical Practice Guideline #14 (1994).

[34] SSA record at pp. 160 & 248-49.

[35] *Id.* at p. 190.

[36] SSA record at pp. 256-58.

limitations and that she retained substantial RFC.  Obesity may cause functional

limitations "in any of the exertional functions such as sitting, standing, walking, lifting,

carrying, pushing, and pulling,"[37] but the record contained no evidence that Ms.

Phillips's weight caused limitations in those functions.

Ms. Phillips's general argument does not sound unreasonable, but there is no

medical evidence suggesting Ms. Phillips could not do medium work.  A reasonable

mind would accept the diagnostic findings, the prescription of conservative treatment,

and the failure to seek treatment as adequate to support the determination that Ms.

Phillips could do medium work.[38]  Ms. Phillips had the burden to prove that she could

not do medium work.[39]  She did not meet that burden.

---

[37] Social Security Ruling 02-1p: Policy Interpretation Ruling on Titles II & XVI: Evaluation of Obesity at ¶ 8, effective Sept. 12, 2002.  *See* 4 The Gale Encyclopedia of Med. 3116 (4th ed.) (describing how obesity stresses the body's organs and increases the risk of problems like fatigue and poor physical fitness).

[38] *See Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990) ("Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (internal citation omitted) .

[39] *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("The claimant first must bear the burden at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work.").

**The ability to do past work**.  Ms. Phillips's other argument challenged the determination that she could do her past work.[40]  This challenge is important to her case because the not-disabled conclusion flowed from the past-work determination.  Ms. Phillips complained that her past work was unskilled work, but that the ALJ stated the work was semi-skilled work.  The Commissioner characterized the classification as a typographical error.[41]  The court agrees.

The vocational expert testified that Ms. Phillips's former work as a small car parts inspector was *unskilled*, light work, that Ms. Phillips performed a medium level.[42]  The ALJ relied on that testimony in determining Ms. Phillips could do her past work, stating the "vocational expert at the last hearing testified that the work was classified as semi-skilled light work, but the claimant performed the job at the medium exertional level."[43]  Comparison of the testimony and the text of the opinion demonstrates that the use of the word "unskilled" in the opinion was a mistake.

The mistake had no impact on the ultimate conclusion because the vocational expert classified the work as medium work and the ALJ determined Ms. Phillips could

---

[40] Docket entry # 13, pp. 9-11.

[41] Docket entry # 14, p. 6.

[42] SSA record at p. 199.

[43] *Id*. at p. 216.

do medium work.  There was no issue about whether Ms. Phillips could perform semi-skilled work.  The ALJ's mistake "is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."[44]

Conclusion.  Substantial evidence supports the ALJ's decision denying Ms. Phillips's applications.  The ALJ made no legal error.  For these reasons, the court DENIES Ms. Phillips's request for relief (docket entry # 2) and AFFIRMS the decision denying the application.

It is so ordered this 20th day of November, 2012.

_____
UNITED STATES MAGISTRATE JUDGE

---

[44] *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999).  *Accord Van Vickle v. Astrue*, 539 F.3d 825, 831 (8th Cir. 2008) (determining ALJ's mis-reading of "walk" as "work" in physician's treatment note was harmless error because nothing indicated the ALJ would have determined that the claimant could not do her past relevant work).